UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SCOTT J. KELLY,

                              Plaintiff,

              v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

DECISION & ORDER

12-CV-6477P

## PRELIMINARY STATEMENT

        Plaintiff Scott J. Kelly ("Kelly") brings this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security (the "Commissioner") denying his application

for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have

consented to the disposition of this case by a United States magistrate judge.  (Docket # 9).

        Currently before the Court are the parties' motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 11, 14).  For the

reasons set forth below, this Court finds that the decision of the Commissioner is not supported

by substantial evidence in the record.  Accordingly, the Commissioner's decision is vacated, and

this claim is remanded solely for the calculation and payment of benefits.

_____

        [1]  After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting
Commissioner of Social Security.

**BACKGROUND**

I.     **Procedural Background**

Kelly applied for benefits on August 25, 2009, alleging he had been disabled since September 29, 2008 due to bipolar disorder, mixed affective state and headaches.  (Tr. 137, 141-151).[2]  On February 26, 2010, the Social Security Administration denied Kelly's claim for disability benefits, finding that he was not disabled.  (Tr. 77).  Kelly requested and was granted a hearing before Administrative Law Judge Thomas P. Tielens (the "ALJ").  (Tr. 84, 105-09).  The ALJ began a hearing in Corning, New York on February 28, 2011.  (Tr. 27-34).  During the hearing, Kelly requested an adjournment in order to permit him to retain counsel to represent him.  (Tr. 29-30).  The ALJ granted the request and conducted a subsequent hearing on June 13, 2011 in Corning, New York.  (Tr. 30, 35).  Kelly was represented at the hearing by his attorney, David Ralph, Esq.  (Tr. 35).  Kelly and his wife, Aislinn Kelly, testified during the hearing.  (Tr. 35, 62-74).  In a decision dated July 12, 2011, the ALJ found that Kelly was not disabled and was not entitled to benefits.  (Tr. 14-22).

On July 18, 2012, the Appeals Council denied Kelly's request for review of the ALJ's decision.  (Tr. 1-5).  Kelly commenced this action on September 9, 2012 seeking review of the Commissioner's decision.  (Docket # 1).

Kelly filed a subsequent application for benefits that was granted on February 1, 2013.  (Docket # 14 at 1).  According to Kelly, the Commissioner found him disabled beginning on July 13, 2011, the day after the ALJ's decision.  (*Id.*).  Accordingly, the relevant period under consideration for this appeal is September 29, 2008 until July 12, 2011.

---

[2]  The administrative transcript shall be referred to as "Tr. __."

II.     **Non-Medical Evidence**

    A.     **Kelly's Application for Benefits**

Kelly was born on December 13, 1969 and is now forty-four years old.  (Tr. 137).

Kelly graduated from high school in a regular class setting in 1988 and completed one year of

college.  (Tr. 149, 480).  According to Kelly, in 1999, he also received information technology

("IT") and network technology training and attended VESID Elmira.  (Tr. 149-50).

Kelly's previous work history includes employment as stock clerk, energy

manager, job coach, factory worker, IT personnel, collection agent and customer service agent.

(Tr. 143).  After graduating from high school, Kelly enlisted in the Navy and served until he was

honorably discharged in 1992.  (Tr. 265).  In 1994, Kelly worked as stock clerk in a retail store

and in energy management for an electrical firm.  (Tr. 143).  The following year, Kelly was

employed as a job coach for an agency.  (*Id.*).  From 1996 through 1999, Kelly was employed as

a factory worker for a manufacturing business.  (*Id.*).

Kelly was next employed from 2000 through 2003 as an IT customer support

person.  (Tr. 143, 190).  According to Kelly, he was responsible for working with approximately

140 sales persons to address technology-related issues relating to computers, software, hardware

and networking.  (Tr. 143).  Kelly reported that his employment ended when the company went

out of business.  (Tr. 40-41).  According to Kelly, at the time, he weighed over 500 pounds and

was released from employment because he could not perform his duties.  (*Id.*).

In 2006, Kelly was employed at Corning Incorporated as an IT customer service

support person.  (Tr. 49-50, 143, 190).  According to Kelly, his supervisor at Corning referred

him to counseling in order to address Kelly's difficulties managing stress.  (Tr. 49-50).  Kelly

testified that he experienced an emotional breakdown at work, causing his primary care physician to excuse him from work for five days.  (Tr. 51).  At the time, Kelly was a probationary employee and, upon his return to work, Corning terminated his employment.  (*Id.*).  During the latter part of 2006, Kelly was employed as a collection agent.  (Tr. 143, 190).  From March 2008 through September 2008, Kelly was employed at Sitel Corporation, as the supervisor of a twenty-employee call center that provided customer service for Verizon Wireless warranties.  (Tr. 46-47, 143, 167, 190).  According to Kelly, he was terminated from this position after a confrontation with a coworker.  (Tr. 46-47).  Kelly has not been employed since.  (Tr. 40).

When Kelly applied for disability benefits, he lived with his wife, Aislinn Kelly ("Aislinn").  (Tr. 152-53).  Kelly reported that his daily activities included showering, dressing, taking medications, eating breakfast, lunch and dinner, attending appointments with his doctor, reading, sleeping, attempting to maintain focus and mood, studying the bible and conversing with his wife.  (Tr. 153).  According to Kelly, he is able to complete personal hygiene tasks without assistance, can perform household chores, including dishes, laundry and vacuuming, and can prepare simple meals.  (Tr. 153-55).  Kelly reports that he needs assistance with some household tasks because he will forget things.  (Tr. 155).  Kelly reports short-term memory difficulties which necessitate reminders to take his medication or to stay on task and which hinder his ability to prepare more complex meals.  Kelly and his wife shop for groceries and household items approximately once a week, and Kelly is also able to purchase items online.  (Tr. 156).

According to Kelly, he has difficulty focusing, remembering things and controlling his mood.  (Tr. 153, 157-59).  Kelly believes that his inability to control his emotions has caused him to be terminated from several jobs.  (*Id.*).  Kelly reports that he has difficulty

sleeping and that his "mind will not shut down." (*Id.*).  In addition, according to Kelly, although his medications help to control his emotions, they also make it difficult to focus for concentrated periods.  (Tr. 156).  Kelly reports that his mood swings and his inability to focus and get along with others have caused him to limit his activities outside of his home and have made it difficult to maintain employment.  (Tr. 157).

According to Kelly, at the time of his application he had a suspended driver's license.  (Tr. 155).  Kelly is able to pay bills, count change and handle a savings account, although he has difficulty remembering to pay bills.  (Tr. 156).  In addition, Kelly has difficulty handling a checkbook because he forgets to record his transactions.  (*Id.*).  According to Kelly, his wife now handles the family finances.  (*Id.*).  Kelly reports that he is able to follow written and verbal instructions, but needs frequent reminders to complete tasks due to his inability to maintain focus.  (Tr. 158-59).

Kelly leaves the house at least once a day to go for a walk.  (Tr. 155).  He spends his time attending bible study with his wife, watching television and visiting his brother and his children.  (Tr. 157).  According to Kelly, he can walk approximately twenty minutes before needing a five or ten minute break.  (Tr. 158).

After the initial denial of benefits, Kelly supplemented his disability application on March 31, 2010.  (Tr. 172-79).  According to that application, Kelly experienced increased mania, shaking in his hands and numbness in his legs.  (Tr. 173).  In addition, Kelly reported that he had been diagnosed with bipolar disorder, anxiety disorder and post-traumatic stress disorder. (*Id.*).  According to Kelly, his extreme anxiety prevented him from participating in any group gatherings and the numbness in his legs decreased his ability to stand or walk for any length of

time.  (Tr. 176).  Kelly reported that he had recently been referred to a new therapist to treat his

mental disorders, including therapy to address his recently-recalled memories of abuse he

suffered as a child.  (Tr. 178).  According to Kelly, he was prescribed lithium carbonate as a

mood stabilizer to control his bipolar symptoms and to manage his anger.  (Tr. 192).  In addition,

Kelly was taking Abilify, Zoloft and Lorazepan to address his anxiety and depression.  (*Id.*).

Finally, Kelly was prescribed Trazodone as a sleep aid.  (*Id.*).

> **B.**     **The Disability Analyst's RFC Assessment**

On February 26, 2010, disability analyst M. Bliznik ("Bliznik") completed a

non-severe impairment checklist.  (Tr. 291).  Bliznik opined that Kelly did not suffer from

abnormalities in any of his physical functions, including walking, lifting, reaching, seeing,

standing, pushing, carrying, hearing, sitting, pulling, handling or speaking.  (*Id.*).  According to

Bliznik, although Kelly complained of hand tremors and leg numbness, Kelly had not been fully

evaluated for those symptoms.  (*Id.*).


**III.**     **Medical Evidence**

In October 2005, Kelly underwent gastric bypass surgery at Strong Memorial

Hospital to address his morbid obesity, diabetes and hypertension.  (Tr. 354-443).  In January

2006, Kelly returned to Strong Memorial Hospital for surgery to remove a pituitary tumor.  (Tr.

444-48).

Kelly apparently began receiving mental health treatment in July 2006 from

Andrea Cohen ("Cohen"), a licensed social worker at the Clinical Associates of the Southern

Tier.  (Tr. 449-58).  During the initial meeting, Kelly reported that he had had a bad weekend that

6

involved a fight with his significant other and over-consumption of alcohol.  (Tr. 458).  Kelly

reported that he attempted to "play chicken" in road traffic, which resulted in police being

dispatched to the scene.  (*Id.*).  Cohen suggested couples counseling.  (*Id.*).

       Cohen's intake form dated September 5, 2006, indicates that Kelly had recently

begun a new job at Corning and had been referred to counseling by his supervisor.  (Tr. 453).  At

the time, Kelly was recently divorced and living with his new girlfriend.  (*Id.*).  Kelly reported

significant credit card debt and problems in his personal life that had affected his relationship

with his coworkers.  (*Id.*).  According to Kelly, he began to isolate himself at work because some

of his coworkers were sharing his personal information with others.  (*Id.*).  Kelly reported that he

consumed a "couple" of glasses of wine each week, but did not suffer from substance abuse.  (Tr.

454).  Cohen noted that Kelly had a flat affect, normal speech, dysphoric mood, appropriate

thought content, good judgment, unimpaired memory and appropriate impulse control.  (*Id.*).

       On September 19, 2006, during another session with Cohen, Kelly reported that

he had substantial credit card debt and was working with a debt consolidation firm to manage the

debt.  (Tr. 452).  Kelly reported that he was experiencing stress at home because of the

relationship between his current girlfriend and his children, and also reported stress arising from

work issues.  (*Id.*).  According to Kelly, he did not trust his supervisor to keep his information

confidential.  (*Id.*).

       Kelly had another appointment with Cohen on September 26, 2006.  (Tr. 451).

Kelly reported experiencing overwhelming feelings of depression at work, which caused him to

leave work at 11:00 a.m.  (*Id.*).  Kelly reported suicidal thoughts and feelings of helplessness and

was unable to make eye contact with Cohen.  (*Id.*).  Cohen suggested that Kelly contact his

primary care physician to discuss his medications, begin looking for other employment and go to the hospital if his depression worsened.  (*Id.*).

At an October 3, 2006 appointment with Cohen, Kelly reported that he had visited Dr. Burke, his primary care physician, who increased Kelly's prescription for Zoloft, prescribed Welbutrin and excused Kelly from work for three days.  (Tr. 450).  Kelly reported that when he returned to work, he was terminated due to issues with a credit card.  (*Id.*).  According to Kelly, he was in the process of trying to address those issues when he was terminated.  (*Id.*).  Kelly reported experiencing mood swings and repeated suicidal thoughts.  (*Id.*).  Cohen reported that Kelly's affect had brightened by the end of the session.  (*Id.*).

Kelly's final appointment with Cohen was on October 31, 2006.  (Tr. 449).  During that session, Kelly reported some positive developments.  (*Id.*).  According to Kelly, he had filed a harassment petition against his ex-wife and was taking her to court to address visitation issues, and would be starting a new job soon.  (*Id.*).  Kelly reported that his depression and anxiety stemmed from his job at Corning.  (*Id.*).  According to Kelly, he still struggled with his body image and headaches.  (*Id.*).  Kelly reported taking oxycodone to manage the headaches.  (*Id.*).

The record does not reflect any medical treatment for the next two years.  On October 13, 2008, Kelly had an appointment with Beth Lynn De Vries "(De Vries"), a nurse practitioner at Arnot Medical Service, where Kelly's primary care physician, Robert E. Burke, M.D. ("Burke") practiced.  (Tr. 211-12).  Kelly complained of nasal congestion and throat and mouth symptoms.  (*Id.*).  Kelly reported minimal alcohol consumption and that he was married

and living with his spouse.  (*Id.*).  De Vries instructed Kelly to increase his fluids and to manage

his symptoms with nasal saline, Tylenol and over-the-counter medication.  (*Id.*).

The following year, in June 2009, Kelly was transported to the emergency room at

the Corning Hospital for a mental health evaluation by the police after a reported suicide attempt.

(Tr. 213-31).  Treatment notes indicate that Kelly was arrested after a reported domestic violence

incident on June 3, 2009.  (Tr. 214).  According to the police, Kelly attempted to hang himself

with his pants while at the police station.  (*Id.*).  Kelly reported prior suicide attempts and feeling

very depressed.  (*Id.*).  According to Kelly, although he had been prescribed Zoloft and

Wellbutrin, he had not been taking his medication.  (*Id.*).  Lab results indicated that Kelly had an

elevated level of alcohol in his system.  (Tr. 215).  Kelly was transferred to St. Joseph's

Behavioral Science Unit ("St. Joseph's") on a mental health commitment.  (Tr. 215-16).

Upon admission to St. Joseph's, Kelly was diagnosed on Axis I with "major

depressive disorder, recurrent, alcohol dependence, impulse control disorder, exacerbated by

drinking."  (Tr. 232).  At Axis IV, Kelly's major stressors included his unemployment,

homelessness, order of protection prohibiting contact with his wife, and history of domestic

violence related to alcohol consumption.  (*Id.*).  Upon admission, Kelly's GAF was 36.  (Tr.

238).

During intake, Kelly reported his family history.  (Tr. 237).  According to Kelly,

his mother remarried multiple times during his childhood, and he experienced a close

relationship with his brother during childhood.  (*Id.*).  Kelly reported that he has two sons with

his first wife.  (*Id.*).  According to Kelly, he married his current wife, Aislinn, in 2007.  (*Id.*).

Aislinn has a five-year-old son who lives with them.  (*Id.*).  Kelly reported that he and his wife

were both unemployed.  (*Id.*).  According to Kelly, he used to consume approximately two or three glasses of wine every night, but he and his wife together currently consume approximately three or four liters of wine daily.  (Tr. 236).  Kelly stated that he had not been taking his medications because he had no insurance and could not pay for them.  (Tr. 235).  Kelly also reported that he experienced headaches approximately two or three times per month since he had undergone surgery to remove a pituitary tumor.  (Tr. 237).

Kelly spent approximately twenty-two days at St. Joseph's.  (Tr. 232).  During that time, he attended individual and group therapy sessions and was prescribed medication to address his mental health issues.  (Tr. 233).  Kelly was discharged from St. Joseph's on June 25, 2009.  (Tr. 232).  Upon discharge, Kelly was referred to the New Dawn Program at St. Joseph's to complete a rehabilitation program, following which he was to be referred to an outpatient mental health provider.  (Tr. 233).  Kelly was prescribed Depakote, Zoloft, coral calcium and alfalfa.  (*Id.*).  His diagnosis at discharge included "major depressive disorder, recurrent, alcohol dependence, rule out bipolar disorder, not otherwise specified, intermittent explosive aggressive disorder" and his GAF was assessed at 55.  (Tr. 232).

Kelly attended the inpatient rehabilitation program from June 25, 2009 through July 23, 2009.  (Tr. 250).  Kelly successfully completed the program and was discharged after meeting his treatment care goals.  (Tr. 251).  Upon discharge, Kelly was referred to Steuben County Alcohol and Substance Abuse Services for outpatient rehabilitation treatment.  (*Id.*).

On July 6, 2009, while still in the inpatient rehabilitation program, Kelly was referred to outpatient mental health treatment at the VA Medical Center located in Bath, New York ("Bath VA").  (Tr. 349).  Initially, Kelly met with Karen M. Aikman ("Aikman"), a

10

licensed social worker and suicide prevention coordinator.  (Tr. 353).  Kelly's initial diagnosis

was bipolar disorder and alcohol dependence with a GAF of 40.  (Tr. 352).

   Kelly participated in another session with Aikman on July 8, 2009.  (Tr. 344).

During that session, Kelly reported his history of depression, alcohol use and anger management

issues.  (Tr. 345).  According to Kelly, his symptoms worsened while he worked at Corning in

2006.  During that time, he was going through a divorce from his first wife.  (*Id.*).  Kelly

maintained that his wife's behavior and frequent phone calls to Kelly at work caused his

termination from employment with Corning.  (*Id.*).  According to Kelly, he married his current

wife, Aislinn, in 2007.  (Tr. 347).  Kelly reported that Aislinn has four children, but only one, a

five-year-old son, currently lives with them.  (*Id.*).  Kelly also reported that his mother passed

away in 2007.  (Tr. 346).  Kelly stated that he was physically abused by his aunt and uncle when

he was nine years old.  (*Id.*).  According to Kelly, the abuse continued until he was sixteen years

old.  (*Id.*).  Kelly reported that his mood had improved since he started taking Depakote.  (*Id.*).

   On August 18, 2009, Kelly had an appointment with Burke.  (Tr. 207-10).  Kelly

explained to Burke that he had recently been discharged from inpatient treatment.  (Tr. 208).

Burke recommended that Kelly continue with his current medications, refrain from alcohol,

continue to meet with his mental health providers and attend Alcoholics Anonymous ("AA")

meetings.  (Tr. 209).  Burke advised Kelly to return in one year or as needed.  (*Id.*).

   On October 8, 2009, Kelly attended an appointment with Kaushalya A. Kumar

("Kumar"), a psychiatrist practicing at the Bath VA.  (Tr. 341, 344).  Kumar noted that Kelly had

a history of bipolar disorder, alcohol dependence and compulsive gambling.  (Tr. 341).  Kelly

reported that he had consumed only one glass of wine since his completion of the New Dawn

rehabilitation program.  (*Id.*).  Kelly reported that he lost his Medicaid coverage on September

23, 2009 and had been off of his medications since that time.  (Tr. 341-42).  According to Kelly,

in the absence of medication, he felt more depressed and irritable and experienced difficulty

sleeping.  (Tr. 341).  Kelly reported ongoing stress, particularly due to his unemployment and

financial situation, but stated that he had not had any suicidal impulses.  (*Id.*).

    Kumar's notes indicate that Kelly presented a constricted affect with a depressed

and anxious mood.  (Tr. 343).  According to Kumar, Kelly frequently lost his train of thought and

complained of racing thoughts.  (*Id.*).  Kumar opined that although Kelly's memory was fair, his

attention and concentration were impaired.  (*Id.*).  Kumar diagnosed Kelly with bipolar disorder,

mixed affective state and alcohol dependence, now in remission.  (*Id.*).  Kumar assessed Kelly's

current GAF at 55.  (*Id.*).  Kumar reinstated Kelly's medications, prescribed Sertraline and

recommended a follow-up appointment in two weeks.  (Tr. 343-44).  Kumar also suggested that

Kelly begin receiving primary care through the Bath VA because he no longer had insurance to

cover the expense of a private primary care physician.  (*Id.*).  Kumar opined that Kelly's mood

was a mixed affective state that required stabilization.  (*Id.*).  Kumar opined that Kelly was

"currently unemployable."  (Tr. 344).

    Kelly met again with Kumar on October 23, 2009.  (Tr. 340).  Kelly reported that

his mood was beginning to stabilize with the medications, but that he was drowsy.  (*Id.*).  Kelly

reported ongoing stress caused by his financial situation.  (*Id.*).  Kumar discussed the possibility

of Kelly applying for temporary disability until his moods could be stabilized.  (*Id.*).  Kumar

prescribed Divalproex to be taken at bedtime.  (Tr. 341).

On the same date, Kelly had an appointment with Dr. Kevin Ott ("Ott") to assess his physical condition.  (Tr. 336).  Ott noted that Kelly exhibited tremors that could be caused by earlier alcohol abuse and recommended a neurological opinion.  (Tr. 339).  Ott reviewed the health risks associated with obesity and recommended that Kelly participate in a program for weight management.  (Tr. 340).

On November 13, 2009, Kelly had another appointment with Kumar.  (Tr. 334).  During that appointment, Kelly reported increased stress, unstable mood, including increased anger and irritability, and manic feelings, including restlessness, inability to focus or concentrate and racing thoughts.  (*Id.*).  Kelly denied any suicidal thoughts or alcohol use.  (Tr. 335).  In addition, Kelly reported that he had been gaining weight.  (*Id.*).  Kumar increased Kelly's Divalproex dosage and prescribed Abilify.  (*Id.*).  Kumar opined that Kelly's moods were unstable, that he would require ongoing medication adjustments and that he was currently "unemployable."  (*Id.*).

Kelly's next appointment with Kumar occurred on December 8, 2009.  (Tr. 330).  During the appointment, Kelly reported that in general his mood had begun to stabilize.  (*Id.*).  According to Kelly, however, he was experiencing increased depression due to his recent recall of painful childhood memories.  (*Id.*).  Kelly told Kumar that the memories were initially triggered by a vivid dream and then confirmed through conversations with Kelly's brother.  (*Id.*).  According to Kelly, the memories involved both physical and sexual abuse inflicted on Kelly by his father and his stepfather.  (*Id.*).  Kelly reported that he inflicted injuries on himself as a child and that the behavior continued into adulthood.  (Tr. 331).

Kumar referred Kelly for individual therapy with a licensed clinical social worker, John C. Gould ("Gould").  (Tr. 332, 334).  Kelly's first session with Gould occurred on December 8, 2009, following his appointment with Kumar.  (Tr. 332).  During the session, Kelly reported that he had stopped going to AA meetings and had consumed "a couple" drinks of alcohol since he had completed the rehabilitation program.  (*Id.*).  Kelly told Gould that he recently had a vivid dream that had caused him to recall some very painful memories involving childhood sexual abuse.  (*Id.*).  According to Kelly, the abuse was inflicted by an older neighborhood boy, a female babysitter and one of his mother's boyfriends.  (*Id.*).  Kelly reported overwhelming feelings of guilt, shame and anger, but denied suicidal urges.  (Tr. 333).

On December 16, 2009, Kelly had separate appointments with Kumar and Gould. (Tr. 328-30).  Kelly told each provider that his anger had decreased, but that he was still experiencing mood fluctuations.  (Tr. 328-29).  According to Kelly, he was still experiencing anxiety, racing thoughts and difficulty focusing and sleeping.  (*Id.*).  Kumar increased Kelly's Abilify dosage and continued his other medications.  (Tr. 328).

Kelly's next appointment with Kumar was on December 31, 2009.  (Tr. 327). Kelly reported that he continued to experience mood fluctuations and had increasing difficulty with manic, as opposed to depressive, symptoms.  (*Id.*).  According to Kelly, although his anger had markedly decreased, he continued to experience sleep difficulties.  (*Id.*).  Kumar increased Kelly's dose of Aripiprazole and continued his other medications.  (*Id.*).

On January 13, 2010, Kelly had an appointment with Kumar, who was planning to leave the clinic.  (Tr. 323).  Kumar's treatment notes from that appointment summarize her treatment history with Kelly.  (Tr. 324-25).  Kumar reported that Kelly continued to have mood

14

fluctuations, particularly manic symptoms, and continued to have difficulty sleeping and

maintaining concentration or focus.  (Tr. 324).  According to Kumar, Kelly continued to gain

weight and had difficulty with motivation and drive.  (*Id.*).  In addition, Kumar noted that Kelly

had not abused alcohol since leaving the rehabilitation program.  (*Id.*).  Kumar prescribed

Trazodone to aid Kelly's sleep, recommended continuing Kelly's current medications, but

indicated that his next psychiatrist might consider whether the Depakote was being properly

absorbed given Kelly's gastric bypass history.  (Tr. 325).  Kumar assessed Kelly's current GAF at

52.  (*Id.*).

Kelly also saw Gould on January 13, 2010.  (*Id.*).  He reported benefits from his

spiritual and religious studies.  (*Id.*).  According to Gould, Kelly expressed anxiety stemming

from an upcoming medical evaluation related to his application for social security benefits.  (*Id.*).

Kelly reported benefits from his medications, but continued mood fluctuations as well.  (*Id.*).

Kelly reported ongoing stress, but no alcohol consumption.  (Tr. 326).  In addition, Kelly stated

that he was seeing a neurologist.  (*Id.*).

On January 21, 2010, state examiner Dr. Sara Long ("Long") conducted a

consultative psychiatric evaluation of Kelly.  (Tr. 264).  During the evaluation, Kelly reported

that he had a prior psychiatric hospitalization involving suicidal ideation and alcohol.  (*Id.*).

Kelly also reported that he suffers from bipolar disorder, anger and depression, but reported a

"huge improvement" with Depakote.  (*Id.*).  Kelly also complained of numbness in his legs,

headaches and hand tremors, which Long noted were observable.  (Tr. 265).  Kelly reported that

he was able to perform his own personal hygiene tasks and could perform some cooking,

cleaning, laundry and shopping, although he sometimes becomes distracted.  (Tr. 267).

Upon examination, Long opined that Kelly was well-oriented and had fluent and clear, although occasionally rambling speech, coherent and goal-directed thought processes, full range of appropriate affect with some anxiety indicated by irregular breathing, a catch in speech and hand trembling, euthymic mood, clear sensorium, intact concentration and memory, and average cognitive functioning with a good fund of information. (Tr. 266). Long assessed that Kelly's insight was poor to fair and his judgment was fair to poor. (*Id.*). According to Long, Kelly could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration and a regular schedule, learn new tasks, perform complex tasks independently and make appropriate decisions, although his abilities could become impaired when distracted by his anxiety. (Tr. 267). In addition, Long opined that Kelly appeared able to relate adequately with others and had good management skills, although he occasionally sought to be pleasing in confrontational situations. (*Id.*). Long recommended that Kelly undergo psychotherapy to develop insight, healthy relationships, boundaries, expectations for self and improved self-esteem and that Kelly's anxiety be addressed from physiological and cognitive perspectives. (Tr. 268). According to Long, Kelly's prognosis with frequent, high-level psychotherapy and medication management was good, but he would need assistance to manage financial matters until family skills could be improved. (*Id.*).

On February 12, 2010, Kelly had an appointment with his new psychiatrist, Akintayo Akinlawok, M.D., MPh ("Akinlawok"). (Tr. 321-22). Kelly reported that his mood swings had decreased, but that he continued to experience "silly" episodes. (Tr. 321). Kelly also reported a twenty-pound weight gain, which he attributed to medication. (*Id.*). Akinlawok opined that Kelly's moods appeared to be related to anxiety, rather than mania. (Tr. 322).

16

Akinlawok decreased Kelly's dosage of Aripiprazole, increased the Divalproax dosage and maintained the dosage for Sertraline.  (*Id.*).

On the same date, Kelly had an appointment with Gould.  (*Id.*).  Kelly reported difficulty completing tasks and sleeping, but reported that his medication was helping control his anger.  (*Id.*).  Kelly reported that he recently consumed one beer while he and his wife were out with friends.  (*Id.*).  Gould noted that Kelly continued to present a baseline level of anxiety with poor sleeping patterns and observed that Kelly's hands "were in fairly constant motion, shaking as he held them together."  (Tr. 323).

On February 26, 2010, agency medical consultant Dr. T. Inman-Dundon ("Inman-Dundon") completed a Psychiatric Review Technique.  (Tr. 273-90).  Inman-Dundon concluded that Kelly's mental impairments did not meet or equal a listed impairment.  (Tr. 276, 278, 281, 283).  According to Inman-Dundon, Kelly suffered from moderate limitations in his ability to maintain social functioning, concentration, persistence or pace and suffered from mild limitation in his activities of daily living.  (Tr. 283).  In addition, according to Inman-Dundon, Kelly had suffered only one or two episodes of deterioration.  (*Id.*).  Inman-Dundon completed a mental residual functional capacity ("RFC") assessment.  (Tr. 287-90).  Inman-Dundon opined that Kelly suffered from moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration, work with others without distraction, complete a normal workday or week without interruption, interact appropriately with the general public, accept instructions and respond appropriately to criticism, get along with coworkers, and respond appropriately to changes in the work setting.  (Tr. 287-88).  According to Inman-Dundon, Kelly retains the ability to perform simple work in a low contact setting.  (Tr. 271).

17

On March 8, 2010, Kelly had an appointment with Ott for a physical examination. (Tr. 317-20).  Kelly complained of increased back pain due to weight gain.  (Tr. 317).  Kelly denied experiencing headaches, but complained of continued tremors and of intermittent paresthesias of the feet.  (*Id.*).  Kelly also reported that he had not been using his CPAP machine and that his sleep apnea had worsened with his weight gain.  (Tr. 320).

On the same date, Kelly had an appointment with Gould.  (Tr. 316).  Treatment notes from that date indicate that Kelly missed the appointment and subsequently explained that he had forgotten it.  (*Id.*).  On March 12, 2010, Kelly was scheduled for an appointment with Aikman, but missed the appointment.  (Tr. 315).

Kelly attended an appointment with Gould on March 17, 2010.  (Tr. 313).  Kelly informed Gould that he had stopped taking Abilify because he believed it had caused him to gain approximately forty-five pounds.  (Tr. 314).  According to Kelly, he had not noticed any significant changes in his moods since discontinuing Abilify and reported that his moods generally had been "pretty good."  (*Id.*).  Kelly reported that his application for social security benefits had been denied and that he was going to hire an attorney.  (*Id.*).  Kelly attributed his missed appointments to poor organization and memory.  (*Id.*).  After this appointment, treatment notes from Gould indicate that Kelly missed or cancelled therapy appointments on March 29, April 1, 8 and 19, 2010.  (Tr. 313).

On May 14, 2010, Kelly attended an appointment with Akinlawok.  (Tr. 309).  During the visit, Kelly informed Akinlawok that he had ceased taking his medications because he was concerned that they were causing him to gain weight.  (*Id.*).  According to Kelly, despite ceasing the medications, he continued to gain weight.  (*Id.*).  In addition, he was experiencing

18

increased irritability.  (*Id.*).  Kelly reported that he was sleeping well at night.  (*Id.*).  Akinlawok

discontinued the Aripiprazole because Kelly had not taken the medication for several months.

(Tr. 310).  Akinlawok continued the Divalproex and the Sertraline.  (*Id.*).

   Kelly met with Gould on July 1, 2010.  (Tr. 308).  Kelly reported increased stress

at home because his wife's unemployment benefits were scheduled to cease and neither of them

could find employment.  (*Id.*).  Kelly reported that his stepchildren visit on the weekends, but

that he had been unable to visit with his children.  (*Id.*).  Kelly indicated that he did not think that

his current medications were working and discussed the possibility of obtaining a new

psychiatrist.  (*Id.*).  According to Kelly, he continued to experience racing thoughts.  (*Id.*).

   On September 7, 2010, Kelly had another session with Gould.  (Tr. 306).  Kelly

reported that he was in the process of moving to his brother's house in Schuyler County.  (*Id.*).

Kelly expressed feelings of stress because he had not seen his children in approximately three

months and his sixteen-year-old son was experiencing emotional problems.  (*Id.*).  Kelly reported

that his medications were not working and that he had increased anger and had many "low" days.

(*Id.*).  Kelly had started taking Abilify again.  (*Id.*).  Kelly continued to read his bible and attend

church, but was having difficulty sleeping.  (*Id.*).

   The following day, Kelly met with a new psychiatrist, Thomas F. Shannon, M.D.

("Shannon").  (*Id.*).  Kelly informed Shannon that he was not absorbing the Depakote tablets.

(Tr. 304).  Kelly reported feeling depressed for a whole day at a time and experiencing high

anxiety and conflict with his wife.  (*Id.*).  Kelly expressed an interest in a prescription for

Lithium.  (*Id.*).

On September 21, 2010, Kelly had an appointment with Gould.  (Tr. 302-03).

Kelly reported that he ceased taking Depakote and had noticed increased irritability and

aggression.  (Tr. 303).  Kelly reported that he and Aislinn continued to see her children and

periodically care for their relatives' two preschool age children.  (*Id.*).  Kelly reported that he

continued to have good days and bad days, and experienced racing thoughts.  (*Id.*).

That same day, Kelly had an appointment with Shannon, his psychiatrist.  (Tr.

301).  Kelly reported increased irritability since discontinuing the Depakote.  (*Id.*).  Shannon

noted that the medications appeared to lessen Kelly's pressured speech and racing thoughts.

(*Id.*).  Shannon continued Kelly's medication and prescribed Lithium.  (Tr. 302).

Gould's treatment notes dated December 14, 2010 recount several appointments

that Kelly cancelled.  (Tr. 300).  According to Gould, Kelly cancelled appointments with either

Gould or the psychiatrist on October 21, November 23, December 14 and December 29, 2010.

(*Id.*).

On January 3, 2011, Joan Mistretta ("Mistretta"), a counselor at the Finger Lakes

Addictions Counseling & Referral Agency, completed an employability assessment of Kelly.

(Tr. 465-67).  Mistretta opined that Kelly's history of substance abuse would not prevent him

from being employed and that any current unemployability would stem from his medical issues,

rather than substance abuse issues.  (*Id.*).

Kelly apparently began treatment at the Schuyler County Community Services

("SCCS") Department of Mental Health, Mental Retardation and Alcoholism Services in January

2011.  (Tr. 475).  On February 16, 2011, Kelly attended a therapy session with Melissa DePaolo

("DePaolo"), a senior social worker.  (Tr. 472, 482).  During the session, Kelly recounted his

medical and family history.  (Tr. 475-82).  Kelly indicated that he was experiencing anxiety

relating to an upcoming hearing on his pending application for SSDI benefits.  (Tr. 476).  Kelly

reported that although Lithium appeared to control his anger, he was still experiencing more bad

days than good days, and that the Abilify caused him to shake constantly.  (Tr. 477).  In addition,

Kelly reported fatigue and difficulty concentrating.  (*Id.*).  Kelly reported that he was consuming

beer occasionally – approximately one beer once or twice per week.  (*Id.*).  Kelly explained that

he wanted to establish a permanent doctor to manage his psychiatric medications.  (Tr. 481).

DePaolo noted that Kelly's stressors included issues with his housing, finances and inconsistent

psychiatric care.  (*Id.*).  Kelly was diagnosed with bipolar and anxiety disorders and assessed with

a GAF of 50.  (*Id.*).

      Treatment notes from the Bath VA dated March 3, 2011 indicate that Kelly

cancelled an appointment with Gould on that date as well.  (*Id.*).  On March 17, 2011, Kelly was

seen by a new psychiatrist, Jose A. Telechea-Mendoza ("Telechea-Mendoza").  (Tr. 298-99).

During the appointment, Telechea-Mendoza noted that Kelly's mood and affect were normal and

appropriate.  (*Id.*).  Telechea-Mendoza recommended reducing Kelly's dose of Aripiprazole and

wanted to monitor the effects of the reduced dosage on Kelly's tremors and akathisia.  (*Id.*).

      On April 11, 2011, Kelly had an appointment with Mihai Dascalu, M.D.

("Dascalu"), a staff psychiatrist at SCCS.  (Tr. 471-73).  Dascalu noted that Kelly was currently

taking Lithium, Abilify, Trazadone and Valium.  (Tr. 471).  Kelly reported that he seemed to be

improving on the Lithium, but that the Abilify was causing uncontrollable shaking.  (*Id.*).

Dascalu noted that Kelly suffered from hand tremors and surmised that they might be caused by

the Lithium.  (Tr. 473).

On May 26, 2011, Dascalu completed a medical source statement reflecting his opinion of Kelly's mental ability to perform work-related activities. (Tr. 468-70). Dascalu opined that Kelly's ability to understand, remember and carry out instructions was affected by his mental impairments. (Tr. 468). Dascalu indicated that even in a home setting Kelly had ongoing and significant difficulties with attention, concentration and understanding and carrying out tasks. (*Id.*). According to Dascalu, Kelly suffered from extreme limitations in his ability to understand and remember complex instructions and to make judgments on complex work-related decisions. (*Id.*). In addition, Kelly suffered marked limitations in his ability to understand and remember simple instructions, make judgments on simple work decisions and carry out complex instructions. (*Id.*). According to Dascalu, Kelly had moderate limitations in his ability to make judgments on simple work-related decisions. (*Id.*).

Dascalu also opined that Kelly's ability to interact appropriately with supervisors, coworkers and the public was affected by his mental impairments. (Tr. 469). According to Dascalu, Kelly had a significant history of employment-related issues. (*Id.*). Dascalu opined that Kelly suffered from extreme limitations in his ability to interact appropriately with coworkers and marked limitations in his ability to interact appropriately with supervisors and to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*). In addition, Dascalu opined that Kelly suffered from moderate limitations in his ability to respond appropriately to the public. (*Id.*). Dascalu also indicated that Kelly suffered from significant hand tremors and that Kelly's mood fluctuations could affect his functioning. (*Id.*). Dascalu opined that these limitations were present before 2009. (*Id.*). Finally, Dascalu noted that Kelly had a history of alcohol abuse and that Kelly had admitted to current use of alcohol. (*Id.*).

22

According to Dascalu, Kelly reported that his current alcohol use did not rise to the level of intoxication and had not occurred in the previous month and thus, in Dascalu's opinion, did not currently contribute to Kelly's identified limitations.  (*Id.*).

On June 10, 2011, Kumar completed a medical source statement reflecting his opinion of Kelly's mental ability to perform work-related activities.  (Tr. 497-99).  Kumar opined that Kelly's ability to understand, remember and carry out instructions was affected by his mental impairments.  (Tr. 497).  Kumar indicated that Kelly's bipolar disorder grossly affected his attention and concentration and that Kelly suffered from racing thoughts and an inability to remain static.  (*Id.*).  According to Kumar, Kelly suffered from extreme limitations in his ability to understand and remember complex instructions, carry out complex instructions and make judgments on complex work-related decisions.  (*Id.*).  In addition, Kumar opined that Kelly suffered marked limitations in his ability to understand and remember simple instructions, carry out simple instructions and make judgments on simple work-related decisions.  (*Id.*).

Kumar also opined that Kelly's ability to interact appropriately with supervisors, coworkers and the public was affected by his mental impairments.  (Tr. 498).  According to Kumar, Kelly suffered from wide mood fluctuations and marked irritability.  (*Id.*).  Kumar opined that Kelly suffered from marked limitations in his ability to interact appropriately with the public, coworkers and supervisors, and to respond appropriately to usual work situations and to changes in a routine work setting.  (*Id.*).  In addition, Kumar opined that Kelly's judgment is impaired when he is a manic stage, which can cause impulsive and poor decision-making.  (*Id.*).  Finally, Kumar indicated that Kelly had abstained from alcohol use after completing his

rehabilitation program and thus, in Kumar's opinion, alcohol use did not contribute to his impairments.  (*Id.*).

IV.    **Proceedings before the ALJ**

At the administrative hearing, Kelly testified that he was currently living with his wife, Aislinn.  (Tr. 39).  Kelly testified that he does not have any children with Aislinn, has two children with his previous wife and that Aislinn has four children from a previous marriage.  (Tr. 39-40).  According to Kelly, none of the children live with Aislinn and him.  (*Id.*).

Kelly testified that he was last employed in September 2008.  (Tr. 38).  At that time, he was a supervisor at Verizon and was responsible for overseeing approximately twenty-four employees.  (Tr. 40, 46).  According to Kelly, he was terminated from that job because he verbally confronted one of his coworkers.  (Tr. 47).  Kelly testified that he often experienced feelings of paranoia or suspicion when working with others.  (Tr. 47-48).  According to Kelly, these feelings affected his ability to work, particularly his ability to complete a full workday.  (*Id.*).  Kelly testified that he was also consuming alcohol during this time period.  (Tr. 48-49).

Prior to his employment with Verizon, Kelly testified that he worked for Corning, Inc. for approximately eight months.  (Tr. 49).  According to Kelly, his supervisor referred him to an employee assistance program through which he received counseling to deal with stress.  (Tr. 49-50).  Kelly testified that he assumed a heavier workload than he could handle, which caused him to experience feelings of stress, paranoia and depression, and he ultimately experienced a breakdown.  (Tr. 50-51).  Eventually, his primary care physician prescribed Zoloft and

Wellbutrin and excused Kelly from work for five days.  (Tr. 51).  According to Kelly, upon his return to work, Corning terminated his employment.  (*Id.*).  Kelly testified that his longest period of employment was between 1999 and 2003 when he was employed at World Kitchen.  (Tr. 41).  According to Kelly, that company entered bankruptcy and he was informed that he would be subject to staffing cuts because his weight exceeded 500 pounds and he could no longer perform his duties.  (*Id.*).

Kelly, who is approximately six feet tall, testified that he had bariatric surgery in 2006 and successfully reduced his weight to approximately 230 pounds.  (Tr. 41-42).  However, according to Kelly, he gained approximately 75 pounds when he was prescribed Depakote and weighed approximately 330 pounds at the time of the hearing.  (*Id.*).  Kelly testified that despite discontinuing the use of Depakote, he had not experienced any weight loss as a result.  (*Id.*).

Kelly testified that he has a history of alcohol abuse, including a 2006 conviction for driving while intoxicated and a 2009 incident of domestic violence involving intoxication.  (Tr. 42).  According to Kelly, in 2009 he drank approximately a half gallon of wine every day.  (*Id.*).  Kelly testified that he currently has an occasional beer.  (Tr. 43).  According to Kelly, although he is an alcoholic, he is able to consume a beer once every couple of weeks.  (*Id.*).  Kelly testified that in February 2010, when he was being treated by Kumar, he abstained from alcohol.  (Tr. 44).  After Kumar moved away, according to Kelly, he experienced a bad episode during which he cut himself.  (*Id.*).  Shortly after that incident, Kelly began to consume a beer on occasion to "relax."  (*Id.*).  Kelly testified that he reported his consumption of alcohol to Akinlawok, his psychiatrist at the time.  (Tr. 45).

Kelly testified that his bipolar disorder causes him to experience periods of elevated mood followed by periods of extremely depressed mood, sometimes within the same day.  (Tr 52).  Kelly explained that he primarily abused alcohol when he was going through his divorce proceedings.  (*Id.*).  According to Kelly, although he continues to consume alcohol occasionally, his mood swings are not related to his alcohol use.  (*Id.*).  Kelly testified that he experiences mood swings on days when he has not consumed alcohol.  (Tr. 53).  Kelly explained that he may experience bad episodes even during weeks when he has not consumed alcohol and that he continues to have suicidal thoughts.  (Tr. 54).

During a typical week, Kelly experiences approximately two or three good days.  (Tr. 54-55).  According to Kelly, even on good days he has difficulty sleeping and completing household tasks.  (Tr. 55).  On bad days, he has no energy and sleeps all day.  (Tr. 56).  Kelly testified that he has problems with his memory and has no hobbies.  (Tr. 57-59).

Kelly testified that he originally began receiving health care at the Bath VA hospital because he did not have any health insurance.  (Tr. 60).  During that time, Kelly received mental health treatment from Kumar until Kumar moved away.  (*Id.*).  After Kumar left, the Bath VA did not have a permanent psychiatrist and, according to Kelly, he was treated by several different psychiatrists, including Shannon and Telechea-Mendoza, and had to wait long periods between appointments.  (Tr. 60-61).  Kelly testified that he sought treatment with Dascalu in Schuyler County in order to gain some consistency in his mental health treatment.  (Tr. 61).

Aislinn also testified at the hearing.  (Tr. 62).  Aislinn testified that prior to 2009 Kelly sometimes consumed approximately five liters of wine daily, although he did not drink wine every day.  (Tr. 66-67).  According to Aislinn, Kelly ceased this behavior when he

completed a rehabilitation program in 2009.  (Tr. 67).  She testified that since then Kelly

consumes no more than two cans of beer at a time.  (Tr. 67-68).

Aislinn testified that Kelly exhibits mood fluctuations throughout the day and

experiences more bad days than good.  (Tr. 68, 73).  According to Aislinn, Kelly is unable to

complete household tasks, has difficulty remembering things and loses focus during tasks.  (Tr.

68, 71-72).  During his depressed periods, Aislinn testified, Kelly is unable to interact with other

people and exhibits low energy levels.  (*Id.*).  In addition, Kelly no longer engages in hobbies or

pastimes.  (Tr. 72-73).

Aislinn testified that she and Kelly lived with her brother, his wife and their two

children for approximately seven months.  (Tr. 69).  In addition, Aislinn's four children stay with

Aislinn and Kelly every other weekend.  (Tr. 69-70).


**V.**     **Evidence Submitted to Appeals Council**

Kelly submitted additional evidence to the Appeals Council on review of the

ALJ's decision.  (Tr. 5).  Specifically, Kelly submitted a medical source statement completed by

Dascalu, dated September 22, 2011.  (Tr. 500-01).  In addition, Kelly submitted additional

records from SCCS reflecting his ongoing psychiatric care both prior and subsequent to the

ALJ's determination.  (Tr. 502-49).

The SCCS records reflect frequent appointments between June 14, 2011 and

December 15, 2011.  (*Id.*).  On June 14, 2011, Kelly had an appointment with Joann Coyle,

LCSW ("Coyle").  (Tr. 527-28).  Coyle's notes indicate that Kelly appeared well-groomed, but

his hands and legs were shaking.  (*Id.*).  Kelly reported thoughts of suicide or harming himself,

racing thoughts and poor memory. (Tr. 527). According to Kelly, although his medication was helpful, he still had many days during which he experienced depression. (*Id.*). Kelly reported that his brother-in-law's family had moved out of the residence, which had decreased Kelly's stress. (*Id.*).

Kelly had another session with Coyle on June 23, 2011. (Tr. 525-26). Kelly complained of family and financial stressors. (Tr. 525). Kelly complained of difficulty focusing and sleeping and admitted to having taken an increased dosage of Lithium and Valium that week. (*Id.*). Coyle explained the dangers of Lithium toxicity. (*Id.*). On July 5, 2011, Kelly had another session with Coyle. (Tr. 523). Kelly complained of racing thoughts and bouts of serious depression and anxiety. (*Id.*).

The following day, Kelly had an appointment with Dascalu. (Tr. 521). Dascalu noted that his last appointment with Kelly occurred the previous month, although the record does not contain treatment notes from that visit. (*Id.*). Kelly complained of depression, anxiety and "manicky episodes." (*Id.*). Dascalu increased Kelly's Lithium dosage. (*Id.*).

On July 12, 2011, Kelly had a therapy session with Coyle. (Tr. 519-20). Kelly reported that the increased Lithium dosage alleviated some of his depressive symptoms, but that it made him more fatigued. (*Id.*). Kelly reported that he was unable to remember to complete tasks throughout the day and experienced stress from his stepchildren's visits to the home. (*Id.*).

On August 3, 2011, Kelly had an appointment with Dascalu. (Tr. 517-18). Dascalu's treatment notes indicate that Kelly had called the office on multiple occasions to complain of auditory hallucinations. (*Id.*). According to Kelly, the hallucinations had commenced approximately six to eight weeks ago and had progressed in severity. (*Id.*). Kelly

reported that the hallucinations occur two to three times each day and are short in duration. (*Id.*).

Dascalu considered whether Kelly's medications could be causing the hallucinations and noted

that he had overlooked the fact that Kelly was also taking Sertraline.  (*Id.*).  Dascalu considered

discontinuing Lithium and prescribing a different anti-psychotic medication, but rejected that

option considering Kelly's "very disturbing tremor." (*Id.*).  Ultimately, Dascalu continued

Kelly's current medications and agreed to closely monitor his mood and symptoms.  (*Id.*).

On August 18, 2011, Dascalu completed a medical source statement reflecting his

opinion of Kelly's ability to perform work-related activities.  (Tr. 500-01).  Dascalu opined that

Kelly did not suffer from any physical limitations in his ability to walk, stand, sit, lift, carry,

push, pull, bend, see, hear, speak or use his hands.  (Tr. 501).  With respect to Kelly's mental

abilities, Dascalu opined that Kelly was very limited in his ability to maintain attention and

concentration and in his ability to function at a consistent pace in a work setting.  (*Id.*).  Dascalu

further opined that Kelly was moderately limited in his ability to understand, remember and carry

out instructions, make simple decisions, interact appropriately with others and maintain socially

appropriate behavior without exhibiting extreme behavior, but that Kelly had no limitations in

his ability to maintain personal hygiene.  (*Id.*).

On September 28, 2011, Dascalu again met with Kelly.  (Tr. 517-18).  Kelly

reported that his sixteen-year-old son was now living with him, which was causing increased

stress.  (*Id.*).  Kelly reported continued auditory, non-command hallucinations.  (*Id.*).  Dascalu

prescribed Haloperidol, which appeared to help control the hallucinations.  (*Id.*).  Dascalu noted

that Kelly would continue to receive psychiatric treatment at SCCS with another psychiatrist.

(*Id.*).

29

The following month, on October 31, 2011, Kelly attended a therapy session with Coyle.  (Tr. 514-15).  During the session, Kelly reported suicidal thoughts and that he had been cutting himself.  (*Id.*).  Kelly complained of increased stress caused by his son moving into the house and Aislinn finding part-time employment.  (*Id.*).  Kelly indicated that he did not think his medications were working and complained of trembling in his hands and legs.  (*Id.*).

On November 14, 2011, Kelly met with Darce Braiman ("Braiman"), a nurse practitioner at SCCS, for a psychiatric evaluation.  (Tr. 512-13).  Kelly reported ongoing stress caused by his son, who recently had been hospitalized.  (*Id.*).  Kelly complained of poor sleep and difficulty with focus and concentration.  (*Id.*).  Kelly reported ongoing auditory hallucinations without commands.  (*Id.*).  Kelly also informed Braiman that he had an appointment with a neurologist to assess his hand and leg tremors to determine whether they are neurologically-based or medication-related.  (*Id.*).  Braiman prescribed Lamictal to help stabilize Kelly's mood.  (*Id.*).  Later that day, Kelly had a therapy session with Coyle.  (Tr. 510-11).  During the session, he generally discussed the difficulties he was having with his son.  (*Id.*).

On November 29, 2011, Kelly participated in a therapy session with Coyle.  (Tr. 508-09).  During that session, Kelly reported that he had not cut himself during the past few weeks and that he continued to experience auditory hallucinations.  (*Id.*).  Kelly reported ongoing difficulties with racing thoughts and ability to concentrate.  (*Id.*).

On December 15, 2011, Kelly met separately with Coyle and Braiman.  (Tr. 505-07).  Kelly reported slight improvement in his mood, but complained that he had been unable to sleep and was experiencing command hallucinations to injure himself.  (*Id.*).  Braiman suggested increasing the Haldol dosage to address the command hallucinations.  (*Id.*).  Coyle

noted that Kelly had not been following her recommendations regarding his daily activities.

(*Id.*).  Kelly agreed to go to the library once a week and to read approximately fifteen minutes

each day.  (*Id.*).

## **DISCUSSION**

### I.     **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the decision"),

*reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*,

134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is

disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are

supported by substantial evidence in the record as a whole or are based on an erroneous legal

standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district

court reviewing the Commissioner's determination to deny disability benefits is directed to

accept the Commissioner's findings of fact unless they are not supported by "substantial

evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if

supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as

"more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal

quotation omitted).

   To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

   A person is disabled for the purposes of SSI and DIB if they are unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) &

1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a

five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per*

*curiam*).  The five-steps are:

   (1) whether the claimant is currently engaged in substantial
     gainful activity;

   (2) if not, whether the claimant has any "severe impairment"
     that "significantly limits [the claimant's] physical or mental
     ability to do basic work activities";

> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.    The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 14-22). Under step one of the process, the ALJ found that Kelly had not engaged in substantial gainful activity since September 29, 2008, the alleged onset date. (Tr. 16). At step two, the ALJ concluded that Kelly has the severe impairments of obesity, bipolar disorder, generalized anxiety disorder and alcohol dependence. (*Id.*). The ALJ noted that the record indicates that Kelly might also suffer from tremors and headaches, but no objective medical evidence suggested that these impairments were severe. (Tr. 17).

At step three, the ALJ determined that Kelly does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (*Id.*). In making this assessment, the ALJ determined whether Kelly had limitations in the four areas of

functioning set forth in the regulations for evaluating mental disorders.  (*Id.*).  Specifically, the

ALJ concluded that Kelly had mild restrictions in his ability to perform activities of daily living

and moderate restrictions in his ability to maintain social functioning and concentration,

persistence and pace.  (*Id.*).  The ALJ further found that Kelly had experienced only one or two

episodes of decompensation.  (*Id.*).  Accordingly, because Kelly did not have at least two marked

limitations or one marked limitation and repeated episodes of decompensation, the ALJ

concluded that Kelly did not satisfy paragraph B criteria for any of the listings.[3]  (*Id.*).

  At step four, the ALJ concluded that Kelly has the RFC to perform simple

repetitive work at all exertional levels.  (Tr. 18).  Specifically, the ALJ determined that Kelly was

able to understand, carry out and remember simple instructions; respond appropriately to

supervision, coworkers and usual work situations; and deal with changes in a routine work

setting.  (*Id.*).  Finally, the ALJ determined that Kelly was unable to perform past work, but that –

considering his age, education, work experience, and RFC – jobs existed in significant numbers

in the national economy that Kelly could perform.  (Tr. 20-21).  In making this determination, the

ALJ concluded that Kelly's nonexertional limitations had little or no effect on the occupational

base of unskilled work at any exertional level because Kelly retained the ability to perform the

basic mental demands of competitive, remunerative, unskilled work.  Thus, the ALJ concluded

that no need existed to consult a vocational expert.  (Tr. 21).  Accordingly, the ALJ found that

Kelly is not disabled.  (*Id.*).

---

[3] The ALJ also determined that the evidence failed to establish the paragraph C criteria.  (Tr. 18).

B.      **Kelly's Contentions**

Kelly contends that the ALJ's determination that he is not disabled is not supported by substantial evidence.  (Docket # 12).  First, Kelly maintains that the ALJ impermissibly failed to give controlling weight to the opinion of Kelly's treating physicians, Kumar and Dascalu.  (*Id.* at 18-24).  In addition, Kelly contends that the ALJ erred at step five because he improperly relied upon the Medical-Vocational Guidelines, instead of consulting a vocational expert.  (*Id.* at 23-24).  Kelly contends that a remand for calculation of benefits is appropriate because the record establishes that Kelly is disabled.  (*Id.* at 24-25).  In the alternative, Kelly contends the matter should be remanded for further administrative proceedings. (*Id.*).  Kelly argues in his reply papers that the ALJ improperly considered his alcohol use before determining whether Kelly was disabled.  (Docket # 17 at 8-9).

II.    **Analysis**

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician, because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture of the claimant's medical history."  *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly consider:

> (1)  the frequency of examination and length, nature, and extent of the treatment relationship,
>
> (2)  the evidence in support of the physician's opinion,
>
> (3)  the consistency of the opinion with the record as a whole,
>
> (4)  whether the opinion is from a specialist, and
>
> (5)  whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)).  "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992 at *4.  The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).  "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

I find that the ALJ failed to provide "good reasons" for his decision to give "little weight" to Kumar's assessment.  In his decision, the ALJ discounted Kumar's assessment of Kelly's capacity to work on the grounds that Kumar had not treated Kelly for approximately one and one-half years prior to authoring the assessment.  (Tr. 20).  In addition, the ALJ found that Kumar's assessment that Kelly was not using alcohol was inconsistent with Kelly's testimony at the administrative hearing that he periodically consumed twelve to twenty-four ounces of beer.  (*Id.*).

Having reviewed the transcript from the administrative hearing, I find that no inconsistency exists between Kumar's statement that Kelly was not using alcohol at the time that he was receiving treatment from Kumar and Kelly's testimony regarding his alcohol use.  Indeed, the ALJ explicitly asked Kelly whether he was consuming alcohol while receiving treatment from Kumar, and Kelly testified that he was not.  (Tr. 43-44).[4]  Further, the ALJ's decision to discount Kumar's opinion merely because of the passage of time is unwarranted.  Kumar provided treatment to Kelly beginning in October 2009 and ending when she left the area in early 2010.  Accordingly, her assessment of Kelly's limitations is directly relevant to the issue of whether Kelly was disabled during the relevant period of September 29, 2008 through July 12,

---

[4] Specifically, Kelly testified as follows:

> ALJ:     Kumar says that you . . . abstained from alcohol after treatment . . . .
>
> Kelly:     Yes, that is true sir, at the time I was seeing Dr. Kumar.
>
>          * * *
>
> ALJ:     Okay.  So you're saying that until February 2010 you were clean and sober?
>
> Kelly:     Yes, sir.

(Tr. 43-44).

2011. Simply stated, I find no basis to conclude that the fact that Kumar relocated her practice and could not continue to treat Kelly renders her assessment of his impairments entitled to less weight, particularly because it was consistent with Kelly's current psychiatrist's opinion. *See Morales v. Astrue*, 2009 WL 1748020, *3 (N.D. Ind. 2009) (on motion for attorney's fees court noted that it had rejected government's argument that ALJ properly discounted treating physician's opinion because physician had not treated plaintiff during the previous two years; "[the treating physician] had a long history of treating [plaintiff], the ALJ was required to provide "good reasons" why he did not grant the medical opinion controlling weight").

The ALJ also gave "little weight" to Dascalu's opinion because it was "inconsistent with the evidence as a whole." (*Id.*). The only inconsistency explicitly identified by the ALJ was Dascalu's statement that Kelly had not had a drink in approximately one month and that alcohol use was not contributing to his impairments. (*Id.*). In discounting Dascalu's opinion, the ALJ failed to mention that Dascalu's assessment explicitly acknowledged that Kelly had reported ongoing alcohol use but had denied consumption to the point of intoxication. (Tr. 469). In addition, Dascalu stated that Kelly had reported that he had not consumed any alcohol during the month prior to the assessment. These statements are consistent with Kelly's testimony that he occasionally drinks one or two beers every few weeks. Accordingly, I conclude that the ALJ failed to set forth "good reasons" for discounting Dascalu's opinion.

The government argues that Dascalu's opinion in not entitled to controlling weight because Dascalu met with Kelly only once prior to rendering his assessment. (Docket # 11-1 at 21). In addition, the government contends that both Kumar's and Dascalu's opinions are otherwise inconsistent with the record evidence as a whole, including the evidence from the

38

consultative examiner, the state psychological consultant, Kumar and Dascalu's treatment notes, and Kelly's own statements concerning his activities of daily living.  (*Id.*).  As an initial matter, the ALJ did not articulate either of these rationales in his decision, and the government's attempts to provide a *post hoc* rationale for the ALJ's determination are not a proper substitute for the ALJ's obligation to provide "good reasons" for the weight accorded to a treating physician's opinion.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("[a] reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action") (internal quotation omitted); *Demera v. Astrue*, 2013 WL 391006, *3 n.3 (E.D.N.Y. 2013) ("[t]he ALJ did not provide these explanations, however, and *post hoc* rationalizations for the ALJ's decision are not entitled to any weight"); *Peralta v. Barnhart*, 2005 WL 1527669, *10 (E.D.N.Y. 2005) ("[government's] explanation of the ALJ's rationale is not a substitute for the ALJ providing good reasons in his decision for the weight given to treating physician's opinions").

In any event, other than the statements concerning alcohol use addressed above, the ALJ did not identify record evidence – whether it was contained in treatment notes, consultative opinions or Kelly's testimony – that was inconsistent with the conclusions reached by Dascalu and Kumar.  Further, I disagree that the opinions of Dascalu and Kumar were inconsistent with the record as a whole.  The recitation of the medical evidence and the hearing testimony as detailed *supra* demonstrates that Dascalu's and Kumar's opinions are consistent with the record and with the testimony presented at the hearing.  In addition, the opinions of Dascalu and Kumar are consistent with each other.  In declining to give these opinions controlling weight, the ALJ failed to acknowledge the treating physician rule and did not reference (much less apply) the factors identified above.  The ALJ's failure to do so prevents this

Court from evaluating the ALJ's reasoning for failing to accord Kelly's treating physicians

controlling weight and warrants remand.  *Hill v. Astrue*, 2013 WL 5472036, *11 (W.D.N.Y.

2013) (remand warranted where ALJ did not give treating physician's opinion controlling weight

and did not "consider the factors articulated in 20 C.F.R. §§ 404.1527(c)(2)") (citing *Cabassa v.

Astrue*, 2012 WL 2202951, *8 (E.D.N.Y. 2012) (remanding where ALJ only made conclusory

statements that treating physician's opinion was inconsistent with treatment notes and failed to

explain rationale for giving opinion "little weight"; ALJ failed to specify which treatment notes

were inconsistent with the treating physician's opinion)).

   I conclude that the government's position that Dascalu's opinion is not entitled to

controlling weight because he had had only one appointment with Kelly prior to rendering his

assessment, even if entitled to consideration despite its absence from the ALJ's opinion, is

unavailing.[5]  Although I agree that relevant caselaw generally supports the government's

position, *see, e.g.*, *Seaton v. Astrue*, 2010 WL 2869561, *8 (N.D.N.Y. 2010) ("the ALJ's finding

that . . . two visits did not constitute an 'ongoing treatment relationship' is reasonable and shall

not be disturbed by this [c]ourt"), I conclude that the government's position ignores the record

evidence demonstrating an ongoing treating relationship between Dascalu and Kelly.

   After receiving the ALJ's unfavorable decision, Kelly supplemented the record by

submitting additional evidence, including updated treatment records from SCCS and an

additional evaluation from Dascalu.  (Tr. 1-5, 500-49).  That evidence became part of the

---

[5]  The government's position with respect to the weight to be afforded to Dascalu's and Kumar's opinions underscores the difficulties facing an individual who is unable to maintain a consistent relationship with a treating physician through no fault of his making.  On the one hand the government seeks to discount Kumar's opinion, despite her demonstrated ongoing treatment relationship with Kelly, on the grounds that she relocated and therefore stopped treating Kelly.  On the other hand, the government seeks to discount the new doctor's opinion on the grounds that it is not based upon a relationship of a sufficiently long duration.

administrative record before this Court when the Appeals Council denied review of the ALJ

decision.  *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) ("new evidence submitted to the

Appeals Council following the ALJ's decision becomes part of the administrative record for

judicial review when the Appeals Council denies review of the ALJ decision").  The updated

records demonstrate that Kelly continued to receive treatment from Dascalu after Dascalu issued

his May 2011 assessment, attending at least three additional appointments with Dascalu over the

course of the next four months.  Such ongoing treatment undercuts any suggestion that Kelly

commenced treatment with Dascalu in order to obtain a favorable opinion in support of his

disability claim.  *Cf. Austin v. Astrue*, 2010 WL 7865079, *10 (D. Conn. 2010) ("[t]he

Commissioner . . . will not find an ongoing treating relationship where the sole source of the

medical relationship arises out of a need to obtain a report in support of a disability claim").

Accordingly, I conclude that Dascalu established an ongoing treating relationship with Kelly and

that his opinion is entitled to controlling weight.

> Accordingly, I conclude that both Kumar's and Dascalu's opinions were entitled

to controlling weight and that the ALJ improperly dismissed those opinions in favor of the

opinions of Long, the consultative examiner who examined Kelly on one occasion, and

Inman-Dundon, the state agency psychologist, who never examined Kelly.  A review of Kumar's

and Dascalu's opinions "reveals that they are consistent with the record and should not have been

disregarded in favor of the opinion of a one-time consultative physician."  *Salisbury*, 2008 WL

5110992 at *6 (ALJ erred by not affording controlling weight to treating physicians where the

opinions were consistent with the other medical evidence in the record); *see Sublette v. Astrue*,

856 F. Supp. 2d 614, 619 (W.D.N.Y. 2012) ("Commissioner has failed to meet his burden to

explain why the opinions of plaintiff's treating physician . . . were not afforded controlling

weight"); *Soto v. Barnhart*, 242 F. Supp. 2d 251, 256 (W.D.N.Y. 2003) (ALJ erred by basing his

ruling on consultative exam and state agency assessment; "the opinions by the plaintiff's treating

physician are entitled to controlling weight").


## III.   <u>Remand</u>

I turn now to the question of whether the required remand should be for the

calculation of benefits or for further development of the record.

"Sentence four of Section 405(g) provides district courts with the authority to

affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the cause

for a rehearing.'" *Butts*, 388 F.3d at 385 (quoting 42 U.S.C. § 405 (g)). "Remand is appropriate

where, due to inconsistencies in the medical evidence and/or significant gaps in the record,

further findings would . . . plainly help to assure the proper disposition of [a] claim." *McGregor*

*v. Comm'r of Soc. Sec.*, 2012 WL 2873559, *12 (N.D.N.Y.) (internal quotations omitted), *report*

*and recommendation adopted*, 2012 WL 2873565 (N.D.N.Y. 2012). In contrast, where there is

"no apparent basis to conclude that a more complete record might support the Commissioner's

decision," a remand for calculation of benefits, as opposed to further fact gathering, is

appropriate. *See Butts*, 388 F.3d at 385-86 (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir.

1999)). Although the "failure to satisfy the treating physician rules constitutes legal error, and

ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence,"

*see Hill v. Astrue*, 2013 WL 5472036 at *13, where "further administrative proceedings would

serve no purpose, remand for the calculation of benefits is warranted, *see Sublette v. Astrue*, 856

F. Supp. 2d at 619 (remanding for calculation of benefits where treating physicians' opinions, once afforded controlling weight, clearly justified a finding of disability); *Salisbury*, 2008 WL 5110992 at *8-9 (remanding for calculation of benefits where ALJ improperly failed to afford controlling weight to treating physician opinions; "[t]hese opinions, together with the [p]laintiff's testimony, provide substantial evidence to support a finding that the [p]laintiff is disabled within the meaning of the Social Security Act and that further evidentiary proceedings would serve no further purpose").

After reviewing the record, including the opinions of Kumar and Dascalu which I have concluded are entitled to controlling weight, I conclude that substantial evidence supports a finding that Kelly is disabled, that no further development of the record would assist the determination, and that a remand for calculation of benefits is warranted. The record establishes that had the ALJ properly credited the opinions of Kumar and Dascalu and given them the controlling weight to which they are entitled, he would have determined that Kelly satisfied the requirements needed to meet the "Affective Disorders" listing set forth in Section 12.04 of the Listings, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

To meet the impairment set forth in Section 12.04 of the Listings, an individual must satisfy the criteria listed in both paragraphs A and B.[6]  Paragraph A requires, in relevant part, the "[m]edically documented persistence, either continuous or intermittent, of . . . [d]epressive syndrome characterized by at least four of the following":  (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight;

---

[6]  The requirements of this section can also be met by establishing the criteria contained in paragraph C of Section 12.04, which I conclude is not applicable to the facts of this case.

(3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; (9) hallucinations, delusions or paranoid thinking.[7]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 (A)(1).  Even a cursory review of the record demonstrates that Kelly has repeatedly sought treatment relating to symptoms of sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucinations and paranoia.  Indeed, the ALJ's decision recognized that Kelly reported "problems focusing, remembering things, completing tasks, getting along with others and sleeping."  (Tr. 17).

To meet the paragraph B criteria, a claimant must demonstrate that the symptoms established in paragraph A result in at least two of the following:  (1) marked restrictions of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 (B).  The Listings define a "marked" limitation as "more than moderate but less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App § 12.00(C).  Activities of daily living include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (C)(1).  The category of concentration,

---

[7]  Paragraph A can also be demonstrated through proof of manic syndrome characterized by three of the following: hyperactivity, pressured speech, flight of ideas, inflated self-esteem, decreased need for sleep, easy destructibility, involvement in activities that can cause pain without appreciation for the consequences, or hallucinations, delusions or paranoia.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 (A)(2).  Finally, paragraph A requirements can also be demonstrated through evidence of "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 (A)(3).  The record reflects that Kelly has experienced both depressive and manic symptoms and has been diagnosed with bipolar disorder.

persistence or pace, "refers to the ability to sustain focused attention and concentration

sufficiently long to permit the timely and appropriate completion of tasks commonly found in

work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (C)(3).  Social functioning refers to

the claimant's "capacity to interact independently, appropriately, effectively and on a sustained

basis with other individuals."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (C)(2).

       The ALJ determined that Kelly's impairment did not satisfy the paragraph B

criteria.  (Tr. 17).  Specifically, the ALJ determined that Kelly suffered "mild restriction in

performing activities of daily living, moderate difficulties in maintaining social functioning,

moderate difficulties in maintaining concentration, persistence or pace, and 1-2 episodes of

decompensation."  (*Id.*).  In reaching this conclusion, the ALJ stated that he gave "some weight"

to Long's opinion that concluded that Kelly had good stress management skills and was able to

learn new tasks, perform complex tasks independently, make appropriate decisions and relate

adequately with others.  (Tr. 19-20).  The ALJ stated that he afforded only "some weight" to

Inman-Dundon's assessment even though his assessment of Kelly's restrictions in these four

categories is identical to the assessment provided by Inman-Dundon.  (Tr. 17, 20, 283).  In

assessing Kelly's restrictions, the ALJ discounted the opinions of Kumar and Dascalu, both of

which indicated marked or extreme limitations in Kelly's ability to understand and follow

instructions, make work-related judgments and interact appropriately with coworkers and

supervisors.  (Tr. 20, 468-70, 497-99).  As discussed above, however, the ALJ's failure to afford

their opinions controlling weight was error and his determination that Kelly did not meet Listing

12.04 is thus not supported by substantial evidence.  *See Garcia v. Comm'r of Soc. Sec.*, 496

F. Supp. 2d 235, 242 (E.D.N.Y. 2007) ("[because] there is no valid basis in the record for

rejecting the opinions of [the treating physicians], the ALJ's finding that [plaintiff] did not satisfy the criteria of Listing 12.04 is not supported by substantial evidence").

       I conclude that the record – including the opinions of Kumar and Dascalu, which are entitled to controlling weight, the extensive treatment notes, and the testimony presented at the hearing – establishes that Kelly's impairments satisfy the requirements of paragraph B of Listing 12.04 and that Kelly is disabled for the purposes of DIB.  Kumar and Dascalu opined that Kelly suffered from either marked or extreme limitations in functions related to his ability to understand and carry out simple or complex instructions,[8] make complex work-related judgments, interact appropriately with coworkers or supervisors, and respond appropriately to usual work situations and to changes in a routine work setting.[9]  (Tr. 468-70, 497-99).  Specifically, Dascalu opined that Kelly suffered from "ongoing, significant problems with attention, concentration, understanding tasks and carry[ing] them out, even in a single household setting."  (Tr. 468).  According to Kumar, "due to [b]ipolar disorder, [Kelly's] attention and concentration are grossly impaired[;] [h]e has racing thought and cannot sit still."  (Tr. 497).

       In addition, the treatment notes are replete with references to Kelly's fluctuating mood swings, inability to maintain focus or concentration, and difficulties interacting with coworkers and supervisors.  Further, Kelly testified that he experienced mood fluctuations

---

   [8]  Dascalu opined that Kelly suffered from moderate restrictions in his ability to carry out simple instructions.  (Tr. 468).

   [9]  Dascalu completed an additional assessment on September 22, 2011.  (Tr. 500-01).  This assessment was prepared after the ALJ's determination and therefore was not discussed in the decision.  In the assessment, Dascalu opined that Kelly is very limited in his ability to maintain attention or concentration or to function in a work setting at a consistent pace.  (Tr. 501).  Dascalu also opined that Kelly was moderately limited in his ability to understand, remember and carry out instructions, interact appropriately with others and maintain socially appropriate behavior. (*Id.*).  According to Dascalu, Kelly "suffers from depression and anxiety and is unable to remain focused on tasks." (*Id.*).

throughout the day several times each week, had difficulty interacting with coworkers and supervisors, was unable to focus on or complete tasks, experienced lack of energy and troubled sleep, and experienced suicidal thoughts.  Thus, substantial evidence in the record supports a finding that Kelly suffers from marked limitations in both social functioning and ability to maintain concentration, persistence or pace and is therefore disabled.

Under these circumstances, a remand for further administrative proceedings is not warranted because there are no inconsistencies or gaps in the record and further evidence does not need to be developed.  *See Sublette*, 856 F. Supp. 2d at 619 (remanding for calculation of benefits; "the opinions of plaintiff's treating physician[s] . . . were entitled to controlling weight; [w]hen credited, those opinions reflect a substantial loss of plaintiff's ability to perform the physical or mental activities required for sedentary work . . . justifying a finding of disability"); *Salisbury*, 2008 WL 5110992 at *9 (ALJ erred by not affording controlling weight to opinions of treating physician; "[t]hese opinions, together with the [p]laintiff's testimony, provide substantial evidence to support a finding that the [p]laintiff is disabled within the meaning of the Social Security Act and that further evidentiary proceedings would serve no further purpose"); *De Matties v. Astrue*, 574 F. Supp. 2d 325, 333 (W.D.N.Y. 2008) ("[t]he record is clear, however, that if the opinion of plaintiff's treating physician controls, there are no jobs in the national economy that plaintiff can perform; [u]nder the circumstances, remand for the calculation and payment of benefits is warranted"); *White ex rel. Johnson v. Barnhart*, 409 F. Supp. 2d 205, 209 (W.D.N.Y. 2006) (remanding for calculation of benefits where record was fully developed and compelled conclusion that claimant had marked limitations in acquiring and using information and where further administrative proceedings would serve no useful purpose

47

and would result in unnecessary delay); *Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 283

(E.D.N.Y. 2005) (remanding for calculation of benefits after concluding that plaintiff's

impairment satisfied the requirements of listing 12.04; "had the ALJ given more weight to the

treating sources, he would have found plaintiff disabled because her limitations were described

as marked in two out of the four areas").  Accordingly, I conclude that a remand solely for the

calculation and payment of benefits is warranted.[10]


## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the

pleadings **(Docket # 11)** is **DENIED**, and Kelly's motion for judgment on the pleadings **(Docket**

**# 12)** is **GRANTED**.  This matter is remanded to the Commissioner for calculation and payment

of benefits.

**IT IS SO ORDERED.**

                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated: Rochester, New York
          July __18__, 2014

---

[10]  Having concluded that a remand for calculation of benefits is warranted, I need not reach Kelly's remaining contentions that the ALJ erred by not consulting a vocational expert or by improperly considering Kelly's alcohol use prior to reaching a conclusion as to whether Kelly was disabled.